**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GARRETT RAYMOND SAINIAK, | : | Civil No. 3:24-cv-538 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| SECURITY LT. NEWBERRY, *et al.*, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff Garrett Sainiak ("Sainiak"), an inmate housed, at all relevant times, at the State Correctional Institution, Frackville, Pennsylvania ("SCI-Frackville"), commenced this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). The remaining Defendants are Lieutenant Newberry, Lieutenant Rainer, Lieutenant Maul, Correctional Officer Storm, Correctional Officer Forte, Correctional Officer Kimmel, and Sergeant Walter.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 38). The motion is ripe for resolution. For the reasons set forth below, the Court will grant the motion.

## I.     Statement of Undisputed Facts[1]

### A.     Facts Related to Placement in the Dry Cell

On September 13, 2022, Sainiak was transferred from SCI-Benner to SCI-Frackville.

(Doc. 51 ¶ 1).  During his deposition, Sainiak testified that, while at SCI-Benner and

preparing for transport, he was told that a drug sniffing dog "hit on" him, indicating the

possible presence of contraband.  (*Id.* ¶ 3).  Sainiak "acknowledge[d] and complied with the

Officers' directions."  (*Id.* ¶ 4).

Upon arrival at SCI-Frackville, Sainiak was subjected to a body cavity search and

was passed through a body scanner by corrections officers.  (*Id.* ¶ 5).  Sainiak was informed

that he was being placed in a dry cell because he was suspected of having contraband on

his person due to the results of the body scan.  (*Id.* ¶ 2).

---

[1]     Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Unless otherwise noted, the factual background herein derives from Defendants' Rule 56.1 statement of material facts.  (Doc. 51).  Although Sainiak filed a brief (Docs. 55, 57) in opposition to Defendants' motion, he failed to file a response to Defendants' statement of material facts.  Therefore, as authorized by Local Rule 56.1, the Court will admit as uncontroverted the statement of facts submitted by Defendants.  *See* M.D. PA. LOCAL RULE OF COURT 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); *see also Rau v. Allstate Fire & Cas. Ins. Co.*, 793 F. App'x 84, 87 (3d Cir. 2019) (upholding this Court's decision to strike non-movant's non-responsive counterstatement of facts under Local Rule 56.1); *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (finding that "the District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance"); *see also* Doc. 40 ¶ 3; Doc. 43 ¶ 3; Doc. 45 ¶ 3; Doc. 48 ¶ 3; Doc. 54 ¶ 3 (advising Sainiak that failure to file a responsive statement of material facts would result in the facts set forth in Defendants' statement of material facts being deemed admitted).

Sainiak was placed in a dry cell for monitoring and was provided a paper smock to wear. (*Id.* ¶ 6). The purpose of the dry cell was to monitor Sainiak's bodily waste to determine if he would pass any contraband. (*Id.* ¶ 7). Sainiak remained in the dry cell from September 13, 2022 to September 16, 2022. (*Id.* ¶ 8). At the conclusion of the monitoring period, contraband was not discovered. (*Id.* ¶ 9).

In his complaint, Sainiak alleged that while in the dry cell, he was not allowed to clean himself or the cell, he had inadequate toilet paper and inadequate food and water, he was exposed to pepper spray and was subjected to constant illumination. (*Id.* ¶ 11; Doc. 1, at 7-9, 12).

Upon release from the dry cell, Sainiak was transferred to the Restrictive Housing Unit ("RHU"). (Doc. 51 ¶ 10).

Defendants maintain that Sainiak has not produced medical records or other evidence demonstrating any physical injury. (*Id.* ¶ 12).

B.    Facts Regarding Exhaustion of Administrative Remedies

The Pennsylvania Department of Corrections (the "DOC" or the "Department") has a formal policy and procedures manual for inmates, which must be followed by inmates who file grievances while incarcerated at state correctional institutions operated by the Department. (*Id.* ¶ 13). The purpose of a grievance is to allow an inmate to bring concerns and complaints to the attention of prison officials. (*Id.*). The grievance procedures are set

forth in the Department's Administrative Directive 804 ("DC-ADM 804"), titled Inmate Grievance System. (*Id.*).

Pursuant to DC-ADM 804, the DOC has the following three-tiered grievance system which serves as an inmate's administrative remedy: (1) an initial review by a Grievance Officer; (2) appeal to the Facility Manager or designee; and (3) appeal to the Secretary's Office of Inmate Grievance and Appeals ("SOIGA") for final review. (*Id.* ¶ 14).

A grievance must be submitted in writing, using the grievance form available on all housing units or blocks, within 15 working days after the events noted in the grievance. (*Id.* ¶ 15). A grievance must include the following: a statement of facts relevant to the claim including the date and approximate time and location of the event(s) giving rise to the grievance; the identity of any individuals who were directly involved in the event(s); any claims the inmate wishes to make concerning violations of DOC directives, regulations, court orders, or other law; and any compensation or legal relief desired. (*Id.* ¶ 16).

Upon receipt on the inmate's grievance, the Facility Grievance Coordinator assigns each grievance (even a rejected grievance) a tracking number and enters it into the Automated Inmate Grievance Tracking System. (*Id.* ¶ 17).

The inmate then receives an initial review response. (*See id.* ¶ 18). If the inmate is dissatisfied with the initial response, he or she may appeal that decision to the Facility Manager. (*Id.*). The Facility Manager then provides a written response to the grievance. (*Id.* ¶ 19). The Facility Manager may uphold the response, uphold the inmate, dismiss the

4

grievance (either as untimely or on the merits), or uphold in part and deny in part. (*Id.*). The Facility Manager may also remand the initial review response for further investigation or consideration. (*Id.*).

If an inmate is not satisfied with the decision of the Facility Manager, he or she may submit an appeal to SOIGA. (*Id.* ¶ 20). Only issues raised in both the original grievance and the appeal to the Facility Manager may be appealed to this level. (*Id.*). SOIGA reviews the original grievance, the initial review response, the appeal to the Facility Manager, the Facility Manager's response, and the appeal to final review. (*Id.* ¶ 21). SOIGA may uphold the response, uphold the inmate, dismiss, or uphold in part and deny in part. (*Id.* ¶ 22). Alternatively, the Chief Grievance Officer may remand the grievance to the facility for further investigation or reconsideration or may refer the appeal to a different bureau. (*Id.*).

Defendants assert that Sainiak filed grievance number 999897, pertaining to the claims raised in this matter. (*Id.* ¶ 23). Defendants maintain that grievance number 999897 was not appropriately exhausted to final review. (*Id.*).

## II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record…or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.  **Discussion**

Defendants seek summary judgment on the following grounds: (1) Sainiak failed to establish an Eighth Amendment violation; (2) Sainiak failed to establish a Fourth Amendment violation; (3) Sainiak's Fourteenth Amendment claim is barred by the more-specific-provision rule; (4) Sainiak failed to establish a First Amendment violation; (5) Sainiak failed to establish a claim for intentional infliction of emotional distress; (6) Sainiak's state law claims are barred by sovereign immunity; and (7) Sainiak failed to properly exhaust his administrative remedies.  (Doc. 52).  The Court begins its analysis with the threshold question of whether Sainiak has exhausted his administrative remedies.

A.    Exhaustion of Administrative Review[2]

Defendants contend that Sainiak failed to properly exhaust any grievances against them in the prison's administrative review process prior to proceeding to federal court. (Doc. 52, at 21-24).

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.*, requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations.  *See id.* § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted).  The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  It has been made clear that the exhaustion requirement is mandatory.  *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same).  "[I]t is beyond the power of [any] court...to excuse compliance with the

---

[2]    Because Defendants raised the issue of exhaustion of administrative remedies, the Court issued an Order notifying the parties that it would consider exhaustion in its role as factfinder in accordance with *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018) and *Small v. Camden Cnty.*, 728 F.3d 265 (3d Cir. 2013), and afforded the parties the opportunity to supplement the record with any additional evidence relevant to exhaustion of administrative remedies.  (Doc. 58).

exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him. *See Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). "An administrative remedy is unavailable when it "operates as a simple dead end[,]...is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)).

As stated, the DOC employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); *Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys.*, Policy No. DC-ADM 804 ("DC-ADM 804"). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5). An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. *Id.* § 2(A)(1). Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. *Id.* § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." *Id.* § 1(A)(11).

Defendants assert that Sainiak filed one relevant grievance—number 999897. (Doc. 52, at 21-24; Doc. 51 ¶ 23; Doc. 51-5). On September 23, 2022, Sainiak filed grievance 999897 with respect to his placement in the dry cell from September 13, 2022 to September 16, 2022. (Doc. 51-5, at 8-11).

On October 19, 2022, the grievance officer issued an initial review response and denied the grievance. (*Id.* at 12). The grievance officer found as follows:

> I have reviewed your grievance and all matters pertinent to your claim. On 9/13/2022, you were transferred to SCI Frackville from SCI Huntingdon.[3] Upon your transfer, an air scan of your person was completed via a drug detection canine, and during this process the canine alerted to the presence of drugs contained on or in your person. Once received at SCI Frackville, a body scan was completed that also detected the presence of a foreign object inside your body. You were then, within DOC Policy 6.3.1 Section 47, placed in a dry cell under observation. As part of this policy, you were also placed in a Secure Cuff Mitt restraint and ankle shackles. During this process, [m]edical staff were present and conducted an examination of the restraints to ensure they were not too restrictive to cut off circulation or cause bodily distress. In addition, while placed in a dry cell status, you were offered an opportunity to exercise/use the bathroom every two hours along with the ability to use the bathroom upon request to staff. As such, your grievance and any relief sought is denied.

(*Id.*).

Sainiak appealed the first-level denial to the Facility Manager. (*Id.* at 13). On November 29, 2022, the Facility Manager upheld the initial response that denied the grievance, and reasoned as follows:

_____

[3] The Court notes that other evidence of record reveals that Sainiak arrived at SCI-Frackville from SCI-Benner, and not from SCI-Huntingdon. (*See* Doc. 51-2, at 3). This discrepancy is immaterial to the resolution of the issues before the Court.

> I have reviewed your appeal and initial review response by UM
> Wegrzynowicz, while reviewing relevant records.  I write at this time to advise
> you that I concur with his initial review response, as he addressed all
> concerns at the initial level.  At my level, you provide nothing further to
> warrant a different response.
>
> Based upon what is reference above, the Facility Manager upholds the initial
> review response.  As a result, all relief sought is denied.

(*Id.* at 14).

On December 8, 2022, Sainiak filed an appeal to SOIGA.  (*Id.* at 4, 15-23).  On

February 2, 2023, SOIGA remanded the matter to the institution for further review, finding

that the institution did not address all of Sainiak's allegations.  (*Id.* at 5-7).

On remand, the institution again denied the grievance.  (*See id.* at 3).  Therefore, on

March 20, 2023, Sainiak filed his second appeal to SOIGA.  (*Id.* at 3).  On May 11, 2023,

SOIGA dismissed the appeal on procedural grounds "due to a failure to comply with the

provisions of the DC-ADM 804" noting that "[a]n appeal to final review is not permitted when

[Sainiak] fail[ed] to comply with submissions procedures" and Sainiak "[has] not provided

[SOIGA] with required and/or legible documentation for review."  (*Id.* at 2).  More

specifically, SOIGA found that Sainiak "failed to provide a copy of the facility's remanded

response.  Additionally, in [his] appeal, [he] failed to provide reason(s) for appealing the

facility's remanded response."  (*Id.*).  Therefore, SOIGA dismissed the grievance appeal.

(*Id.*).

This grievance history confirms that Sainiak failed to properly exhaust grievance

number 999897.  DC-ADM 804 makes it clear that an inmate appealing a grievance to final

12

review must provide SOIGA with all required documentation relevant to the appeal and that

his failure to do so may result in the dismissal of the appeal. As stated, the DOC's

grievance policy consists of three steps. The final step involves an appeal to the SOIGA

within 15 working days of the Facility Manager's Appeal Response. A proper appeal to final

review must include: "(1) a legible copy of the Initial Grievance; (2) a copy of the initial

review response/rejection and/or remanded initial review response/rejection; (3) a legible

copy of the Inmate Appeal to the Facility Manager; (4) a copy of the Facility

Manager/designee's decision and/or remanded Facility Manager/designee's decision; (5) a

written appeal to the SOIGA…" DC-ADM 804 § 2(B)(1)(j). "[F]ailure to provide any of the

documentation noted above may result in the appeal being dismissed." *Id.* § 2(B)(1)(j)(6).

The evidence confirms that Sainiak failed to comply with these requirements. A prisoner's

failure to comply with the procedural and substantive requirements of the DOC's grievance

policy, as set forth in DC-ADM 804, results in procedural default, thereby precluding an

action in federal court. *See Woodford*, 548 U.S. at 84, 90-91; *Spruill*, 372 F.3d at 227-32.

  By failing to give SOIGA the required documentation for his grievance appeal,

Sainiak has not followed the applicable procedures outlined in DC-ADM 804, which "supply

the yardstick for measuring procedural default." *Spruill,* 372 F.3d at 231. An inmate's

failure to submit the required documents to SOIGA results in the inmate failing to exhaust

administrative remedies. *See, e.g.*, *Mack v. Klopotoski*, 540 F. App'x 108, 113 (3d Cir.

2013) (affirming dismissal for inmate's failure to properly exhaust because inmate had failed

to include photocopies of his appeals to the Facility Manager and rejecting substantial compliance argument that inmate filed handwritten copies since DC-ADM 804 specifically required photocopies).

As the remaining Defendants have provided evidence to support their failure to exhaust defense, the burden shifts to Sainiak to produce evidence that the DOC grievance remedies were not available to him.  Sainiak has failed to meet this burden.

Sainiak has not provided any basis to excuse his procedural default of grievance number 999897.  Instead, Sainiak simply argues that he exhausted his administrative remedies by filing a final appeal to SOIGA and receiving its decision on May 11, 2023. (Doc. 57, at 11-15).  Sainiak's argument misses the mark.  Sainiak has not presented any evidence that he complied with the requirements of Section 2 of DC-ADM 804 regarding appeals to Final Review.  It is thus undisputed that Sainiak failed to comply with the requirements of DC-ADM 804 for filing a proper appeal to final review.

Under certain circumstances, administrative remedies may not be effectively available to an inmate, preventing a timely pursuit of the prison grievance process.  *See, e.g., Camp*, 219 F.3d at 281; *Shifflett*, 934 F.3d at 359 ("a prisoner exhausts his administrative remedies as soon as the prison fails to respond to a properly submitted grievance in a timely fashion"); *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016) (holding that prison officials rendered plaintiff's administrative remedies unavailable when they failed to timely respond to his grievance and ignored his follow-up

requests for a decision). The record does not support a finding that the administrative process was unavailable to Sainiak, nor does Sainiak set forth any argument that the grievance process was unavailable to him or that Defendants obstructed his access to the prison grievance system. (See Doc. 57). To the contrary, the record establishes that Sainiak had full and ready access to the administrative remedy process.

In sum, grievance number 999897 was not properly exhausted. Sainiak has not provided any basis to excuse his failure to exhaust administrative remedies. Under Rule 56, Sainiak was required to establish the existence of a genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 324. He has failed to do so. Consequently, the Court concludes that Sainiak has not properly exhausted the claims in this action, and Defendants are entitled to an entry of summary judgment in their favor. *See Spruill*, 372 F.3d at 222, 230.

Even had Sainiak properly exhausted, Defendants are also entitled to summary judgment on the merits of the claims, as set forth below.

### B.  Eighth Amendment Claim

The Eighth Amendment's prohibition of cruel and unusual punishment imposes constitutional limitations on a prisoner's conditions of confinement. *See Graham v. Connor*, 490 U.S. 386 (1989); *Rhodes v. Chapman*, 452 U.S. 337 (1981). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Gilblom v. Gillipsie*, 435 F. App'x 165, 168 (3d Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

First, the plaintiff must allege a deprivation that is "objectively, sufficiently serious." *Gilblom*, 435 F. App'x at 168 (quoting *Farmer*, 511 U.S. at 834). The objective component is narrowly defined: only "extreme deprivations" suffice to make out an Eighth Amendment claim. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citing *Rhodes*, 452 U.S. at 347). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). "[A] totality of the circumstances test must be applied to determine whether the conditions of confinement constitute cruel and unusual punishment." *Tillery v. Owens*, 907 F.2d 418, 427 (3d Cir. 1990).

Second, the plaintiff must show that the prison official "subjectively acted with a sufficiently culpable state of mind, i.e., deliberate indifference." *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000). Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. *Wilson*, 501 U.S. at 298.

Sainiak maintains that Defendants violated his Eighth Amendment rights by placing him in the dry cell, and he challenges the various conditions and deprivations he allegedly suffered during his confinement therein. (Doc. 1, at 12). Sainiak asserts that his Eighth Amendment rights were violated when he was forced to spend time in the dry cell in a paper gown, having his private parts exposed, in restraints, without adequate toilet paper, without

16

the ability to clean himself or the cell, without adequate food and water, and while being exposed to pepper spray, and being under constant lighting. (*Id.* at 7-9, 12).

As the Supreme Court and the Court of Appeals for the Third Circuit have explained, when considering whether conditions of confinement violated the Eighth Amendment, "the Constitution does not mandate comfortable prisons." *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020) (quoting *Rhodes*, 452 U.S. at 349). "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. Courts consider "the length of confinement, the amount of time prisoners must spend in their cells each day, the opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation, and showers." *Tillery*, 907 F.2d at 427. With respect to a dry cell, the Third Circuit has explained:

> A 'dry cell' is a cell that lacks water—all standing water has been drained from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access. An inmate may be placed in a dry cell when prison staff have observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband.

*Thomas*, 948 F.3d at 137.

While "administrative confinement in a dry cell is unpleasant and often unsanitary, so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas*, 948 F.3d at 138-39 (citing *Young v. Quinlan*, 960 F.2d 351, 364-65 (3d Cir. 1992)); *see also Gilblom*, 435 F. App'x at 169 (explaining that "[m]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees" and holding that "the need to ensure that contraband would not be brought into the prison certainly justified [the plaintiff's] placement in a dry cell") (citing *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)).

The Court recognizes that the "duration and conditions of...confinement cannot be ignored in deciding whether such confinement meets constitutional standards[;]" however, "[t]he touchstone is the health of the inmate." *Young*, 960 F.2d at 364.

Sainiak sets forth specific deprivations he allegedly suffered during his confinement in the dry cell for approximately three days after he was suspected of ingesting contraband. (Doc. 1, at 7-9, 12). As stated, Sainiak asserts that he was not able to clean himself or the cell, he was provided inadequate toilet paper, food, and water, his paper gown ripped on one occasion and his private parts were exposed before he was provided a new gown, his restraints were too tight, and he was exposed to pepper spray and constant light. (*Id.*).

Upon consideration of the record, the Court finds that the conditions of which Sainiak complains, while certainly unpleasant, do not rise to the level of an Eighth Amendment violation. There is no evidence that Defendants knew of and disregarded a substantial risk of harm caused by the conditions Sainiak asserts. The Third Circuit has noted that the temporary denial of soap or toilet paper does not violate the Eighth Amendment. *See Brooks v. Bledsoe*, 682 F. App'x 164, 170 (3d Cir. 2017) (prisoner denied sheets, blankets, and toilet paper); *Freeman v. Miller*, 615 F. App'x 72, 77 (3d Cir. 2015) (prisoner denied soap for 7 days). Further, while Sainiak complains of inadequate food and water, the denial of a meal on one occasion does not rise to the level of a constitutional violation. *See Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) (prisoner denied one meal). Moreover, the record is replete with evidence that Sainiak was regularly offered food and water, which he refused to accept on some occasions. (Doc. 51-2, at 5-100). In addition, the constant lighting does not violate the Eighth Amendment because Sainiak does not indicate that he suffered any medical issue due to the three-day period of constant illumination. *See Stewart v. Beard*, 417 F. App'x 117, 118 (3d Cir. 2011) (24-hour illumination in the RHU). While Sainiak asserts that his restraints caused numbness in his hands, the undisputed evidence reflects that he received medical attention for this condition and staff exercised his hands every day that he was in the dry cell, assessed his restraints and adjusted them as needed. (Doc. 51-2, at 5-6, 19-20, 25-100). Whether examined

separately or collectively, the evidence does not support a finding that the conditions of Sainiak's confinement in the dry cell amounted to a constitutional violation.

With respect to the duration of confinement in the dry cell, the record reflects that Sainiak was in the dry cell from September 13, 2022 to September 16, 2022. (Doc. 51-2, at 4, 10). Sainiak does not challenge the duration of his time in the dry cell. (*See* Doc. 1). The Court will nonetheless address the duration of Sainiak's confinement in the dry cell.

In *Thomas v. Tice*, a prisoner was placed in a dry cell after a guard in the visitation room saw the prisoner ingest what the guard suspected may have been contraband. *Thomas*, 948 F.3d at 139. After four days of his confinement, the prisoner's stool was examined and an x-ray was taken of the prisoner's abdominal cavity, which both showed no evidence of contraband. *Id.* at 137. Nevertheless, the prison decided to continue the prisoner's confinement in the dry cell for five more days. *Id.* The prisoner-plaintiff asserted two Eighth Amendment challenges to his confinement in a dry cell: (1) specific deprivations he allegedly suffered during his confinement; and (2) the duration of that confinement. *Id.* at 139. Specifically, the prisoner argued that he should have been released from the dry cell when the guard's initial suspicion that the prisoner ingested contraband was dispelled when an x-ray revealed that his abdominal cavity was clean. *Id.* at 140.

Initially, the United States District Court for the Middle District of Pennsylvania granted summary judgment, finding that the prisoner's conditions of confinement claim failed because the prisoner did not produce evidence to provide a sufficient basis upon

which a reasonable jury could conclude that the individual defendants had knowledge of the

prisoner's conditions of confinement. *Id.* at 139. However, on appeal, the Third Circuit

found that summary judgment was inappropriate on the duration of the prisoner's

confinement issue. *Id.* at 140. The Court reiterated "that when administrative confinement

in a dry cell is not foul or inhuman, and serves a legitimate penological interest, it will not

violate the Eighth Amendment." *Id.* However, the Third Circuit found that there was a

disputed issue of material fact as to whether there was a penological justification to continue

the prisoner's administrative confinement in the dry cell after the x-ray revealed that his

abdominal cavity was empty. *Id.* Therefore, the Third Circuit reversed, in part, the order

granting summary judgment on the issue of the prisoner's duration of confinement issue. *Id.*

Here, the undisputed evidence reflects that a drug sniffing dog alerted prison officials

to the presence of contraband on Sainiak. Once Sainiak arrived at SCI-Frackville on

September 13, 2022, he underwent an initial body scan at 18:30:00 hours and a body cavity

search at 18:47:00. (Doc. 1, at 6; Doc. 51-2, at 3-5). The scan "produced images of

unknown objects or stool inside the inmate[']s abdominal area." (Doc. 51-2, at 3). On

September 13, 2022 at 19:02:00 hours, Sainiak emptied his bowels and no contraband was

found. (Doc. 51-2, at 5). On September 13, 2022 at 19:10:00 hours, Sainiak underwent

another scan. (Doc. 51-2, at 5). The second scan "appear[ed] to show some of the objects/

stool gone but the possibility of a left over object or possibly left over stool in the same

area." (Doc. 51-2, at 3) (sic). Sainiak was then placed back in the dry cell. (*Id.*). On

September 13, 2022 at 19:25:00 hours, Sainiak underwent another scan, which appeared to show something in his abdominal area. (Doc. 51-2, at 3, 5). On September 14, 2022 at 21:00:00 hours, another body scan was conducted.[4] (Doc. 51-2, at 5, 53-54, 59). On September 15, 2022 at 13:00:00 hours, Sainiak emptied his bowels and no contraband was found. (Doc. 51-2, at 6). On September 16, 2022 at 7:00:00, Sainiak underwent an x-ray in the medical department, which did not show anything inside Sainiak. (*Id.*; Doc. 1, at 8). On September 16, 2022, at 16:29:00 hours Sainiak emptied his bowels a third time.[5] (Doc. 51-2, at 6). On September 16, 2022, around 16:53 hours, Sainiak was a placed through a body scanner and "[t]he scan was clear." (Doc. 51-2, at 99). Sainiak was then released from the dry cell on September 16, 2022. (Doc. 51-2, at 6).

There is no evidence that Sainiak went through a body scanner after the results were clear. Sainiak was a placed through his final body scan on September 16, 2022 around 16:53 hours, which revealed no contraband within his person. (Doc. 51-2, at 99). Afterward, staff terminated Sainiak's confinement in the dry cell. (Doc. 51-2, at 6).

Defendants have established a legitimate penological justification for confining Sainiak in a dry cell and evidence in the record confirms that Defendants terminated that confinement once it was established that Sainiak's scan and x-ray were clear. Sainiak does

---

[4]    The record does not appear to contain the results of this body scan. (*See* Doc. 51-2, at 5, 53-54, 59).

[5]    At his deposition, Sainiak testified that he was told he must remain in the cell "until [he] defecate[s] three times." (Doc. 51-3, at 16, Deposition of Garrett Sainiak, Notes of Transcript 15:22-23).

not proffer evidence to establish that Defendants continued his confinement in violation of the Eighth Amendment.  Therefore, Defendants are entitled to summary judgment on the duration of confinement issue.

      C.    <u>Fourth Amendment Claim</u>

Sainiak asserts a Fourth Amendment claim arising from the body cavity search and the body scans.  (Doc. 1, at 12).  He claims that he endured "unreasonable searches" by being forced to undergo a body cavity search and go through the body scans.  (*Id.*).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons…against unreasonable searches and seizures." U.S. Const. amend. IV.  Inmates do not have a Fourth Amendment right to be free of strip searches under all circumstances. *See Bell*, 441 U.S. 520.  Although strip searches constitute a "significant intrusion on an individual's privacy," *United States v. Whitted*, 541 F.3d 480, 486 (3d Cir. 2008), where prison officials conduct such searches in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility, strip searches do not violate the Fourth Amendment.  *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 621 F.3d 296, 309-11 (3d Cir. 2010), *affirmed*, 566 U.S. 318 (2012).

When determining the reasonableness of a strip search, courts must balance "the need for the particular search against the invasion of personal rights that the search entails" and consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Bell*, 441 U.S. at 558-59

(holding that the prison's policy of strip and visual body cavity searches, requiring inmates to stand naked, lift their genitals and bend over and spread their buttocks for visual inspection, did not violate an inmate's Fourth Amendment rights); *see also Brown v. Blaine*, 185 F. App'x 166, 169-70 (3d Cir. 2006) (finding no constitutional violation where inmate was required to lift his genitals, spread his buttocks, and then place his hands on his head and sweep his mouth with his fingers).

The Supreme Court also held that it is constitutional to conduct a full strip search of an individual detained in the general population of a jail, regardless of the reason for detention or the existence of reasonable suspicion that the individual is concealing something. *Florence*, 566 U.S. at 328 (explaining that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities"); *see also Small v. Wetzel*, 528 F. App'x 202, 207 (3d Cir. 2013) (holding that it is constitutional to conduct a full strip search of an inmate in general population, "regardless of the reason for detention or the existence of reasonable suspicion that the individual is concealing something") (citing *Florence*, 566 U.S. 318).

Moreover, there is no violation of an inmate's constitutional rights by conducting the strip search, including a visual body cavity search, in front of other inmates. *See Illes v. Beard*, No. 1:12-cv-964, 2013 WL 2285565, at *5 (M.D. Pa. May 23, 2013); *Eby v. Karnes*, No. 1:19-cv-2069, 2020 WL 1550634 (M.D. Pa. Apr. 1, 2020) (where the search was performed in front of other inmates and included a visual cavity search).

24

Sainiak has failed to set forth any facts or present any evidence demonstrating that the body cavity search and body scans were unreasonable. As outlined above, the undisputed record reveals that a drug sniffing dog alerted prison officials to the presence of contraband on Sainiak. Therefore, when Sainiak arrived at SCI-Frackville on September 13, 2022, he underwent a body cavity search and was placed through a body scanner. (Doc. 1, at 6; Doc. 51-2, at 3-5). He underwent more body scans and an x-ray of his abdominal area. Once the body scan was clear and the x-ray showed no signs of anything inside Sainiak, he was released from the dry cell and the searches ceased. (Doc. 51-2, at 3-5, 8, 99).

With respect to his Fourth Amendment unreasonable search claim, Sainiak failed to provide specific facts showing that there is a genuine issue for trial. It is undisputed that the drug sniffing dog alerted prison officials to the presence of contraband on Sainiak, and that the first two body scans showed something inside Sainiak's person. Sainiak failed to establish that there was no legitimate penological justification for the searches or that the searches took on an unreasonable scope and manner. Therefore, the Court will grant Defendants' motion with respect to the Fourth Amendment claim.

D.    Fourteenth Amendment Claim

Sainiak asserts a Fourteenth Amendment due process claim arising out of his placement in the dry cell. (Doc. 1, at 12). The conduct Sainiak alleges in support of his Fourteenth Amendment claim is based on the same conduct he alleges in support of his

Eighth Amendment claim. (*Id.*). Sainiak does not indicate if he is asserting a Fourteenth Amendment procedural due process claim or a substantive due process claim. (*See id.*, stating that Sainiak is alleging "the violation of [his] due process rights"). The Court interprets Sainiak's complaint as raising a Fourteenth Amendment substantive due process claim concerning his placement in the dry cell. To the extent that Sainiak is attempting to assert a substantive due process claim regarding his placement in the dry cell, such a claim is barred by the more-specific-provision rule.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution contains both procedural and substantive protections. *See* U.S. Const. amend. XIV, § 1. The substantive component of the Due Process Clause safeguards against certain deprivations of individuals' "life, liberty, and property" by state actors "regardless of the fairness of the procedures used to implement them." *L.R. v. Sch. Dist. Of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). A substantive due process claim, however, cannot be maintained when the alleged constitutional violation is "covered by a specific constitutional provision, such as the Fourth or Eighth Amendment." *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 447 (3d Cir. 2020) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). In such situations, the claim must be analyzed under the rubric of the more specific constitutional provision rather than substantive due process, *see id.*, as substantive due process is an "unchartered area" with "scarce and open-ended" guideposts, *Collins*, 503 U.S. at 125. The "more-specific-

provision rule" will often apply when the challenged conduct underlying the substantive due process claim is the same conduct that implicates a more explicit constitutional provision. *See Porter*, 974 F.3d at 448.

Insofar as Sainiak is asserting a substantive due process claim for his placement in the dry cell, that claim is barred by the more-specific-provision rule. The Court will grant summary judgment to Defendants with respect to Sainiak's Fourteenth Amendment substantive due process claim.

    E.   <u>First Amendment Claim</u>

Sainiak also sets forth a First Amendment retaliation claim. (Doc. 1, at 6, 12). Sainiak asserts that Defendant Newberry retaliated against him for being a drug dealer. (*Id.* at 6; *see also* Doc. 57, at 9). He asserts that Defendant Newberry retaliated by placing him in the dry cell. (*Id.*).

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he was engaged in constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally

protected conduct was 'a substantial or motivating factor' in the decision to discipline him."

*Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is

filed is relevant, but not dispositive, for the purpose of establishing a causal link between the

two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when

the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal

proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*,

126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy

this burden "with evidence of either (1) an unusually suggestive temporal proximity between

the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism

coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d

Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison

officials to show, by a preponderance of the evidence, that "they would have made the

same decision absent the protected conduct for reasons reasonably related to a legitimate

penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same

decision defense." *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it

defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

In the instant case, there is no evidence that Sainiak engaged in constitutionally

protected activity. Sainiak avers as follows: "Security Lt. Newberry told me that I was being

placed in a dry-cell. When I asked why, he told me he knows I'm a drug dealer and have

drugs." (Doc. 1, at 6). While Sainiak believes the Defendant Newberry's action was

retaliatory, he does not set forth a legal claim of retaliation. As stated, Sainiak asserts that

Defendant Newberry retaliated against him because he was a drug dealer. However, it is

implausible that Sainiak's alleged criminal activity, which he asserts triggered the retaliation,

was a constitutionally protected activity. *See, e.g.*, *Timmons v. Issac*, No. 1:20-cv-2035,

2023 WL 348992, at *7 (M.D. Pa. Jan. 20, 2023), *appeal dismissed*, No. 23-1344, 2023 WL

5521065 (3d Cir. Apr. 25, 2023) (explaining that "[c]ommitting homicide is not protected by

the First Amendment."). Sainiak failed to present any evidence that Defendant Newberry's

action was taken due to Sainiak's participation in a constitutionally protected activity.

Sainiak has thus failed to meet the first prong of a retaliation claim.

In any event, nothing in the record suggests that Defendant Newberry took action

solely based upon his alleged belief that Sainiak was a drug dealer. Accordingly, the Court

will grant summary judgment to Defendant Newberry with respect to the retaliation claim.

    F.    *State Law Claim*

Sainiak asserts that Defendants intentionally inflicted emotional distress upon him.

(Doc. 1, at 12). He appears to assert that his placement in the dry cell, the inability to clean

himself or the cell, the loss of feelings in his hands, being escorted through the prison with a

29

ripped smock, the exposure to pepper spray, and the exposure to constant illumination, caused him emotional distress.  (*See generally* Doc. 1).

To maintain a claim for intentional infliction of emotional distress under Pennsylvania law, a plaintiff must demonstrate "(1) extreme or outrageous conduct [that] (2) intentionally or recklessly causes (3) severe emotional distress to another."  *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010) (citing *Carson v. City of Phila.*, 574 A.2d 1184, 1187 (Pa. Commw. Ct. 1990)).  Nothing in the record, however, establishes that Defendants acted intentionally or recklessly to cause Sainiak severe emotional distress.  (*See* Doc. 51-2).

Moreover, in Pennsylvania, sovereign immunity applies to intentional torts committed by Commonwealth defendants acting in their individual capacities.  *See Sears v. Mooney*, No. 1:17-cv-50, 2019 WL 6726839, at *17 (M.D. Pa. Dec. 11, 2019) (citation omitted). Sovereign immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" *Larsen v. State Emps' Ret. Sys.*, 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008).  As a general matter, subject only to ten specific statutory exceptions not applicable here, this sovereign immunity bars state law tort claims like the one alleged here, since Commonwealth

employees are immune from liability for either negligence or intentional torts.[6] *McGrath v.*

*Johnson*, 67 F.Supp.2d 499, 511 (E.D. Pa. 1999), *aff'd*, 35 F. App'x 357 (3d Cir. 2002).

Here, the evidence of record demonstrates that Defendants were acting within the scope of

their employment.  Accordingly, they are entitled to sovereign immunity as well.  Thus, the

Court will grant Defendants' motion for summary judgment with respect to Sainiak's claim

for intentional infliction of emotional distress.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Rule 56 motion and enter

judgment in their favor.  (Doc. 38).  A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: February ___3___, 2026

---

[6]    The ten categories for which sovereign immunity will not apply are: (1) vehicles in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) the care, custody, or control of personal property; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways created by potholes or sinkholes; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.  *See* 42 PA. CONS. STAT. ANN. § 8522(b).